UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAUL MARTINEZ, *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>WELLS FARGO BANK,<br><br>        Defendant.<br>_____/ | No. C-12-6006 EMC<br><br>**ORDER GRANTING PLAINTIFFS' MOTION TO REMAND; AND DENYING DEFENDANT'S MOTION TO DISMISS AS MOOT**<br><br>**(Docket Nos. 4, 14)** |

## I.   INTRODUCTION

At issue is whether, for purposes of diversity jurisdiction, a national bank is a citizen solely of the state in which its main office is located, as identified in its articles of association (the "state of association"), or is also a citizen of the state in which its principal place of business is located. Plaintiffs Raul Martinez and Martha L. Miranda initially brought this action in state court against the successor in interest to the lender for their property at 327 Foerster Street, San Francisco, California (the "Property"), Defendant Wells Fargo Bank, N.A. ("Wells Fargo"), based on Defendant's conduct surrounding issuance and servicing of the note for the Property. *See* Compl., Docket No. 1 Ex. A. Plaintiffs assert state law claims for (1) violation of California Business & Professions Code section 17200 (the "UCL" claim) based on unfair conduct and fraudulent conduct; (2) fraud; (3) negligent misrepresentation; and (4) breach of the implied covenant of good faith and fair dealing. *See* Compl. After Defendant removed the case to this Court on the basis of diversity jurisdiction, it brought the instant motion to dismiss. *See* Mot. to Dismiss, Docket No. 4. Plaintiff brought the instant motion to remand. *See* Mot. to Remand, Docket No. 14. As the Court finds Defendant to be a citizen of

California, diversity jurisdiction is lacking, and thus the Court **GRANTS** Plaintiff's motion for remand. Defendant's motion to dismiss is **DENIED** as moot.

## II. FACTUAL & PROCEDURAL BACKGROUND

This case stems from an adjustable rate mortgage note for $532,800 (the "Note") obtained by Plaintiffs in March 2005. *See* Compl. ¶¶ 17, 19, Ex. 2.[1] Plaintiffs are Spanish speakers with limited ability to read, speak, and understand English. *Id.* ¶ 44. Plaintiffs obtained the loan through loan broker Infinity Financial Consultants Inc. ("Infinity") and John Balladeres (collectively, "the Brokers"), neither of which are defendants in the current action. *See id.* ¶¶ 3, 52-54. Defendant Wells Fargo is a national bank with the main office identified in its articles of association in South Dakota, but its principal place of business in California. *See* Remand RJN, Docket No. 19, Ex. 5 art. II, ¶ 1;[2] Mot. to Remand 4 (arguing Wells Fargo's principal place of business is in California); Def.'s Opp'n to Mot. to Remand ("Def.'s Opp'n"), Docket No. 18 (not disputing assertion that California is principal place of business).

Plaintiffs' claims are based on two general sets of allegations. First, the bulk of the complaint is devoted to Plaintiffs' allegations that Wells Fargo and the Brokers took part in various deceptive practices that induced Plaintiffs to sign the Note, such as failing to disclose that the loan was designed to cause negative amortization to occur, failing to disclose that the initial interest rate was only temporary, and failing to disclose that unpaid interest would be added to the principal of the loan. *See* Compl. ¶¶ 66 (UCL claim), 88 (fraud claim), 102-05 (negligent misrepresentation claim), 119 (breach of covenant claim). The Brokers and Wells Fargo represented "that their minimum monthly payments would pay off the balance of the loan during their negotiations with Plaintiffs . . . ." *Id.* ¶¶ 30, 46. No one explained any of the loan documents to Plaintiffs in Spanish

---

[1] The Court takes judicial notice of the documents attached to Plaintiffs' complaint, which are the deed of trust for the Property (Ex. 1) and the Note (Ex. 2). *See U.S. v. Corinthian Colleges*, 655 F.3d 984, 999 (9th Cir. 2011) (court may "consider materials that are submitted with and attached to the Complaint" in considering Rule 12(b)(6) motion).

[2] The Court takes judicial notice of Defendant's certified articles of association as a document that is in the public record and subject to verification. *See Fernandez v. Wells Fargo Bank, N.A.*, No. C-12-3941 NC, 2012 WL 5350256, at *1 (N.D. Cal. Oct. 29, 2012) (taking judicial notice of same document).

2

1  and none of the documents were presented to Plaintiffs in advance. *Id.* ¶ 33. As a result of these
2  representations and omissions, Plaintiffs executed the Note. *Id.* ¶ 31. Plaintiffs did not realize that
3  the representations made at the time they executed the Note were false until November 2011, when
4  they sought advice in an attempt to modify their loan with a fixed interest rate. *Id.* ¶ 43.

Second, although not discussed in the facts section of the complaint, Plaintiffs' UCL and breach of covenant causes of action include allegations that Wells Fargo has "assessed improper or excessive late fees"; "improperly characterized Plaintiffs' account as being in default or delinquent status to generate unwarranted fees"; "misapplied, or failed to apply Plaintiffs' payments"; tried to collect and/or collected various improper fees, costs and charges." Compl. ¶¶ 68, 121.

In arguing whether there is diversity jurisdiction, the parties contest the citizenship of Wells Fargo. At the hearing on this matter on January 31, 2013, the Court ordered the parties to submit supplemental briefing detailing the legislative history behind adoption of the principal place of business standard in 1958, which the parties filed on April 1, 2013. *See* Docket Nos. 20-23.

### III. MOTION TO REMAND

A. Statutory Backdrop

In order for this Court to retain jurisdiction over the case, there must be complete diversity between the parties. *See* 28 U.S.C. § 1441(b). Normally, corporate citizenship is governed by 28 U.S.C. § 1332(c)(1), which provides that a corporation is a citizen of both its state of incorporation and, since 1958, the state in which its principal places of business is located. However, national banks,[3] such as Wells Fargo, are subject to a separate jurisdiction provision, 28 U.S.C. § 1348 ("§ 1348"), which provides, in full, that

> The district courts shall have original jurisdiction of any civil action commenced by the United States, or by direction of any officer thereof, against any national banking association, any civil action to wind up the affairs of any such association, and any action by a banking association established in the district for which the court is held, under chapter 2 of Title 12, to enjoin the Comptroller of the Currency, or any receiver acting under his direction, as provided by such chapter.

---

[3] National banks are "corporate entities chartered not by any State, but by the Comptroller of the Currency of the U.S. Treasury." *Wachovia Bank v. Schmidt*, 546 U.S. 303, 306 (2006).

3

> *All national banking associations shall, for the purposes of all other actions by or against them, be deemed citizens of the States in which they are respectively located.*

28 U.S.C. § 1348 (emphasis added). However, the statute does not define where national banks are "located" for purposes of jurisdiction, nor is such a definition obvious.

B.   Case Law Regarding National Bank Citizenship

Courts have struggled to interpret the last phrase in § 1348. *Compare World Trade Center Properties, L.L.C. v. Hartford Fire Ins. Co.*, 345 F.3d 154 (2d Cir. 2003) (a national bank is "a citizen of every state in which it has offices."), *abrogated by Wachovia Bank v. Schmidt*, 546 U.S. 303, 309 (2006), *with Firstar Bank, N.A. v. Faul*, 253 F.3d 982, 993 (7th Cir. 2001) (national banks are "located" in "the state where the bank's principal place of business is found and the state listed on its organization certificate."), *and with Wells Fargo Bank, N.A. v. WMR e-Pin, LLC*, 653 F.3d 702, 709 (8th Cir. 2011) (a national bank is "located" only in the state of its main office).

In *Wachovia Bank v. Schmidt*, 546 U.S. 303, 307 (2006), the Supreme Court rejected an interpretation of § 1348 that national banks are citizens of every state in which they have a branch and instead determined "that a national bank, for § 1348 purposes, is a citizen of the State in which its main office, as set forth in its articles of association, is located." However, the Court did not reach the question of whether a national bank may *also* be a citizen of the state in which its principal place of business is located, specifically leaving that question unresolved. *See id.* at 317 n.9. *Schmidt* left open the door to either of two interpretations, that a national bank is a citizen of: (1) only its state of association (the state in which its main office is listed in its articles of association); or (2) both its state of association and the state in which its principal place of business is located. *See WMR e-Pin*, 653 F.3d at 707 (*Schmidt* did not consider whether a national bank is also a citizen of the state of its principal place of business). The Court turns to the reasoning in *Schmidt*, the various lower court cases that have considered this issue, and legislative history and legislative policy underlying § 1348 and related statutes to determine which of these two interpretations is correct.

///

///

1. *Schmidt*

In *Schmidt*, the lower court had found that a national bank is a citizen of every state in which it has established a branch. *See* 546 U.S. at 307. The Supreme Court rejected that interpretation and instead found that national banks are citizens of their states of association. In so holding, *Schmidt* first looked to the legislative history behind § 1348. As set forth in *Schmidt*, Congress authorized national banks in 1863, providing that suits in which a national bank was a party could automatically be brought in all federal courts. *See id.* at 309-10 (citing Act of Feb. 25, 1863, § 59, 12 Stat. 681). In contrast, state banks and other state-incorporated entities could only access federal courts on the basis of diversity of citizenship or federal question jurisdiction. *See id.* at 310.

National banks' automatic qualification for federal jurisdiction ended in 1882, when Congress passed a bill providing for jurisdictional parity with state-chartered banks, such that jurisdiction would be "the same as, and not other than, the jurisdiction for suits by or against" state banks from the state where national banks were doing business. *See id.* (quoting Act of July 12, 1882, § 4, 22 Stat. 163). Congress thus established parity between national and local banks for purposes of jurisdiction.

In 1887, Congress again revised the law governing national banks, inserting, for the first time, the current language defining where a national bank was "located" for diversity purposes:

> [A]ll national banking associations established under the laws of the United States shall, for the purposes of all actions by or against them, real, personal or mixed, and all suits in equity, *be deemed citizens of the States in which they are respectively located*; and in such cases the circuit and district courts shall not have jurisdiction other than such as they would have in cases between individual citizens of the same State.

*See id.* at 310-11 (quoting Act of Mar. 3, 1887, § 4, 24 Stat. 554-55 (the "1887 Act")) (emphasis added by *Schmidt*). Despite the removal of language explicitly equating national banks to state banks for jurisdictional purposes, the 1887 Act still "'sought to limit . . . the access of national banks to, and their suability in, the federal courts *to the same extent* to which non-national banks [were] so limited.'" *Id.* at 311 (quoting *Mercantile Nat'l Bank at Dallas v. Langdeau*, 371 U.S. 555, 565-66 (1963)) (emphasis added). *See also Fed. Intermediate Credit Bank of Columbia, S.C. v. Mitchell*, 277 U.S. 213, 215-16 (1928) ("national banks were by the acts of 1882 and 1887 put *on the same*

*basis* in respect of jurisdiction as if they had not been organized under an act of Congress") (emphasis added). In short, in the 1887 Act, Congress retained parity between national and local banks in accessing the jurisdiction of the federal courts.

In the Judicial Code of 1911, Congress combined two formerly discrete provisions regarding national banks, but kept without revision the language adopted in 1887 indicating that national banks would "be deemed citizens of the States in which they are respectively located." *See Schmidt*, 546 U.S. at 311 (citing Act of Mar. 3, 1911, § 24 (Sixteenth), 36 Stat. 1091-93 (the "1911 Act")); *see also Mitchell*, 277 U.S. at 216 (1911 Act was "in substance a re-enactment of the earlier provisions in respect of such jurisdiction."). Nothing suggests Congress intended to breach the parity between national and local banks.

In 1948, Congress adopted the current statute governing national bank citizenship for purposes of diversity, 28 U.S.C. § 1348. Section 1348 maintains the same language for national bank citizenship for purposes of diversity jurisdiction as contained in the predecessor acts of 1887 and 1911, providing that "[a]ll national banking associations shall, for the purposes of all other actions by or against them, *be deemed citizens of the States in which they are respectively located.*" *See Schmidt*, 546 U.S. at 311-12 (citing Act of June 25, 1948, 62 Stat. 933) (emphasis added). Notably, the Court in *Schmidt* did not find that the jurisdictional parity established in 1882 no longer applied under § 1348.

After setting forth the historical development of § 1348 and then rejecting several rationales for recognizing national bank citizenship based on every state in which a national bank has a branch, the Court compared national banks to state banks and non-banking corporations to determine that national banks are citizens of their states of association. *See id.* at 313-17. It noted that, unlike the rule set forth in the appellate court's decision, "this Court's reading of the venue provision in [*Citizens & Southern Nat'l Bank v.*] *Bougas* effectively *aligned* the treatment of national banks for venue purposes with the treatment of state banks and corporations." *Id.* at 316-17 (emphasis added). The Court repeatedly expressed concern that treating national banks as citizens of every state in which they conduct business would "render[] national banks singularly disfavored corporate bodies with regard to their access to federal courts." *Id.* at 319; *see also id.* at 307 ("access of a federally

chartered bank to a federal forum would be drastically curtailed *in comparison to* the access afforded state banks and other state incorporated entities" if national banks were found to be citizens of every state with a branch) (emphasis added); *id.* at 317 (such a reading "severely constricts national banks' access to diversity jurisdiction as *compared to* the access available to corporations generally") (emphasis added). Nowhere does it suggest that national banks should be treated as only citizens of their states of association, which would effectively render them "singularly []*favored* corporate bodies with regard to their access to federal courts." (Emphasis added.) Thus, while the Court did not address the precise issue raised in the instant case, the analytical thrust behind the Supreme Court's holding in *Schmidt* was to preserve parity between national banks on the one hand, and local banks and corporations on the other.

In footnote nine of its opinion, the Court did highlight the difference between the language used to grant diversity jurisdiction over a corporation under 28 U.S.C. § 1332 – that it "shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business" – and national banks under § 1348 which are "citizens of the States in which they are respectively located" noting the latter does not mention principal place of business. *Id.* at 317 n.9. However, the Court did not conclude that the difference in language was meant to overturn a decades long policy of jurisdictional parity. Rather, the Court refrained from deciding an issue not before it, recognizing that "[t]he absence of a 'principal place of business' reference in § 1348 may be of scant practical significance for, in almost every case, as in this one, the location of a national bank's main office and of its principal place of business coincide." *Id.*

2. <u>Ninth Circuit Precedent</u>

Prior to *Schmidt*, the Ninth Circuit held in *American Surety Co. v. Bank of California*, 133 F.2d 160, 162 (9th Cir. 1943), that "the 'States in which they (national banking associations) are respectively located' are those states in which their principal places of business are maintained" and thus "[t]he trial court was right in holding that defendant is a citizen only of the state in which its principal place of business is located." The statute at issue contained the same language as currently in § 1348. Thus, literally read, *American Surety*, if still good law, is binding on this Court and resolves the question left open in *Schmidt*. Moreover, apart from its specific holding, the central

teaching of *American Surety* is its reliance on "a close analogy between [a national] bank and a corporation national in scope," *i.e.* parity. *Id.* at 162. That teaching is consistent with *Schmidt*.

Importantly, *American Surety* has not been overruled by any subsequent opinion of the Ninth Circuit. In fact, the Ninth Circuit has twice cited *American Surety* with approval. *See U.S. Nat'l Bank v. Hill*, 434 F.2d 1019, 1020 (9th Cir. 1970); *Bank of Cal. Nat'l Ass'n v. Twin Harbors Lumber Co.*, 465 F.2d 489, 492 (9th Cir. 1972).

Wells Fargo advances several arguments for avoiding *American Surety*'s holding that principal place of business may serve as grounds for a national bank's citizenship: (1) that *Schmidt* and *American Surety* each advance exclusive tests for national bank citizenship, and are thus irreconcilable; (2) that *American Surety* did not consider the National Bank Act for examples of how "located" is used and is thus no longer good law on this point; (3) that *American Surety* did not consider whether a national bank could be a citizen of a state where its principal place of business is located in addition to a state where its main office is located; (4) that the analogy to corporations in *American Surety* was necessary only due to the lack of case law defining "located"; and (5) that *American Surety* relied on a misstatement of the law. *See* Def.'s Opp'n 8-10.

The Court finds *American Surety* remains good law in this Circuit. In *Taheny v. Wells Fargo Bank, N.A.*, 878 F. Supp. 2d 1093 (2012), Judge Karlton's extensive and well reasoned opinion disposed of the first argument, finding that *American Surety* remained good law. As pointed out by *Taheny*, "'where intervening Supreme Court authority is clearly irreconcilable with . . . prior circuit court authority . . .[,] district courts should consider themselves bound by the intervening higher authority and reject the prior opinion of [the circuit court] as having been effectively overruled.'" *Id.* at 1100 (quoting *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc)). Unless *Schmidt* is "clearly irreconcilable with *American Surety*, the latter still binds this Court. The two decisions are not clearly irreconcilable. As *Taheny* found, "*Schmidt* and *American Surety* each identify a different possibility for citizenship – main office or principal place of business – without excluding the other possibility." *Id.* at 1100. In fact, both opinions reached their conclusions by rejecting the interpretation that a national bank could be a citizen of every state in which it maintains a branch. *See id.* In so holding, *Schmidt* left open the possibility that a national bank could be

deemed a citizen of the state of its principal place of business, a result consistent with *American Surety*. *American Surety* likewise did not rule out the possibility that citizenship could be located in the state of the national bank's main office as *Schmidt* held – that question was not presented in *American Surety*.[4]

      The Court likewise concludes *American Surety* remains binding precedent and joins the ranks of an increasing number of courts within the Ninth Circuit so holding. *See, e.g.*, *Adams v. Wells Fargo Bank, N.A.*, No. C-13-0256 MCE, 2013 WL 1907746, at *2 (E.D. Cal. May 7, 2013); *Ortiz v. Wells Fargo Bank, N.A.*, No. C-13-0060 GPC, 2013 WL 1702790, at *4 (S.D. Cal. Apr. 19, 2013); *Grace v. Wells Fargo Bank, N.A.*, No. C-12-2050 GPC, 2013 WL 663169, at *4 (S.D. Cal. Feb. 21, 2013); *Bickoff v. Wells Fargo Bank, N.A.*, No. C-11-2452 BEN, 2013 WL 100323, at *4 n.4 (S.D. Cal. Jan. 4, 2013); *Cesar v. Wells Fargo Bank, N.A.*, No. C-12-1614 MCE, 2012 WL 5289332, at *2 (E.D. Cal. Oct. 23, 2012); *Gosal v. Wells Fargo Bank, N.A.*, No. C-12-2024 GEB, 2012 WL 4961696, at *1 (E.D. Cal. Oct. 15, 2012); *Hun Gim v. Wells Fargo Home Mortg. Inc.*, No. C-12-5686 DDP, 2012 WL 3848659, at *1 (C.D. Cal. Sept. 5, 2012); *Shirk v. Wells Fargo Bank, N.A.*, No. C-12-1118 IEG, 2012 WL 6951901, at *1-2 (S.D. Cal. July 17, 2012); *Singer v. Wells Fargo Bank, N.A.*, No. C-12-801 JVS, 2012 WL 2847790, at *3-5 (C.D. Cal. July 11, 2012); *Rodriguez v. Wells Fargo Bank, Nat'l Ass'n*, No. C-12-469 BEN, 2012 WL 1940572, at *4 n.4 (S.D. Cal. May 25, 2012).

      As *American Surety* has not been overruled by the Supreme Court or the Ninth Circuit, Wells Fargo's remaining arguments suggesting that *American Surety* was wrongly decided are inapposite. Even if the Court were to entertain these arguments on the merits and disregard the binding effect of *American Surety*, Wells Fargo's arguments are not persuasive. As for Wells Fargo's argument that *American Surety* failed to consider the National Bank Act (which establishes, *e.g.*, venue for suits involving national banks), any such failure is immaterial. Although the National Bank Act uses "located" to mean "the site of the banking association's designated main office" and "refers to or includes branch offices," (but not principal place of business), as *Schmidt* pointed out, "the term

---

[4] *Taheny* also examined independent reasons why *American Surety* remains good law. Judge Karlton analysis is persuasive.

1  'located,' as it appears in the National Bank Act, has no fixed, plain meaning." 546 U.S. at 313-14.
2  Moreover, § 1348 is found in the Judicial Code and Judiciary Act, not the National Bank Act; there
3  is no compelling basis for using the National Bank Act as an interpretive tool in analyzing § 1348.
4  *See Horton v. Bank One, N.A.*, 387 F.3d 426, 433-34, 435 (5th Cir. 2004). Indeed, *Schmidt* held that
5  the National Bank Act's provision regarding venue cannot be read as *in pari materia* with § 1348's
6  prescription for jurisdiction. 546 U.S. at 315-16.

7  Wells Fargo has not explained why it is material that *American Surety* did not consider
8  whether a national bank could be a citizen of both its state of association and the state in which its
9  principal place of business is located. The court in *American Surety*, like in *Schmidt*, was presented
10 with a situation wherein the national bank's principal place of business and main office were located
11 in the same state. *See American Surety Co. of N.Y. v. Bank of Cal.*, 44 F. Supp. 81, 82 (D. Or. 1941)
12 (underlying case). As in *Schmidt*, the court in *American Surety* rejected the argument that a national
13 bank could be a citizen of every state in which it maintained a branch office. There was no occasion
14 to consider whether a national bank may also be a citizen of its state of association.

15 Wells Fargo argues that the reasoning of *American Surety* was flawed because it analogized
16 banks to corporations for jurisdiction purposes at a time when there was then no case law on national
17 bank citizenship; *Schmidt* subsequently provided clear guidance not available to the Ninth Circuit in
18 *American Surety*. Wells Fargo's argument is unpersuasive. *Schmidt* and other cases have made
19 clear that Congress intended to maintain parity between national banks and non-banking
20 corporations, a result entirely consistent with *American Surety*. *See* 546 U.S. at 316-17. As noted
21 above, *Schmidt* and *American Surety* are not inconsistent; *Schmidt* acknowledged case law
22 interpreting § 1348 as setting the principal place of business as a national bank's citizenship (*i.e.*,
23 *Horton* and *Firstar*) and left that question open. 546 U.S. 317 n. 9.

24 To be sure, there is some support for Wells Fargo's fifth argument, that, at the time *American*
25 *Surety* was decided, it wrongfully assumed that corporate citizenship was based on principal place of
26 business. *See* Def.'s Opp'n 10. As explained by the Supreme Court recently in *Hertz Corp. v.*
27 *Friend*, "[i]n 1928 this Court made clear that the 'state of incorporation' rule was virtually absolute"
28 such that "a corporation closely identified with State A could proceed in a federal court located in

that State as long as the corporation had filed its incorporation papers in State B, perhaps a State where the corporation did no business at all." 130 S. Ct. 1181, 1188 (2010) (citing *Black and White Taxicab & Transfer Co. v. Brown and Yellow Taxicab & Transfer Co.*, 276 U.S. 518, 522-525 (1928)). Thus, the conclusion in *American Surety* that "[t]he citizenship of a corporation is fixed by its principal place of business," appears to have been a misstatement of the law at the time. However, regardless of whether *American Surety* correctly identified the test for determining corporate citizenship as of 19483, the thrust of its analysis was predicated on jurisdictional parity between national banks and corporations; that rational was correct and consistent with *Schmidt*. The central teaching of *American Surety* remained in tact even after *Schmidt*.

### 3. Other Circuit Court Authority

Aside from the Ninth Circuit in *American Surety*, three other circuits have addressed the question of national bank citizenship: the Fifth, Seventh, and Eighth Circuits. *See Firstar Bank, N.A. v. Faul*, 253 F.3d 982 (7th Cir. 2001); *Horton v. Bank One, N.A.*, 387 F.3d 426 (5th Cir. 2004); *Wells Fargo Bank, N.A. v. WMR e-Pin, LLC*, 653 F.3d 702 (8th Cir. 2011). Of these opinions, both the Seventh Circuit's opinion in *Firstar* and then the Fifth Circuit's opinion in *Horton* set forth persuasive arguments for recognizing both principal place of business and state of association as bases for national bank citizenship.

In *Firstar Bank*, the Seventh Circuit applied the principle of jurisdictional parity in holding that a national bank is a citizen of both the state in which its principal place of business is located and its state of association. After determining that the ordinary definition of "located" does not provide a clear answer, it considered the subject matter to which it refers, national banks. 253 F.3d at 987. It concluded that "a national bank appears to be analogous in most respects to a corporation rather than some other kind of business organization, and thus one would expect that 'located' in the jurisdictional context means the same thing for a bank as it does for a corporation." *Id.* at 988. "While a national bank is not incorporated in a state, the organization certificate . . . serves a function similar to a certificate of incorporation." *Id.* at 993-94. Next, it concluded that when § 1348 was enacted in 1948, there was a backdrop of sixty years of judicial interpretation assuming "that national banks were to have the same access to the federal courts as state banks and

11

1  corporations," yet "[n]o language in the statute indicate[d] a rejection of this existing construction."
2  *Id.* at 988. It directly confronted the argument against interpreting § 1348 in light of § 1332 (which
3  for the first time defined corporate citizenship to include principal place of business), enacted ten
4  years later in 1958; the court noted that "the 'classic judicial task of reconciling many laws enacted
5  over time, and getting them to 'make sense' in combination, necessarily assumes that the
6  implications of a statute may be altered by the implications of a later statute.'" *Id.* at 993 n.5
7  (quoting *U.S. v. Fausto*, 484 U.S. 439, 453 (1988)).

   In *Horton*, the Fifth Circuit largely reiterated the reasoning from *Firstar*. *See Horton*, 387
9  F.3d at 429. It analyzed the history of national bank citizenship to determine "that Congress enacted
10 section 1348 against a backdrop of equal access to the federal courts for national banks, state banks,
11 and corporations" and, by not changing the statutory language from § 1348's predecessor, "intended
12 to retain and incorporate the existing interpretive backdrop." *Id.* at 430-31. Then, it concluded that,
13 pursuant to application of such jurisdictional parity, a national bank, like a state bank, may have no
14 more than two possible states of citizenship. *Id.* at 431. Ultimately, it concluded, after rejecting
15 rationales for recognizing citizenship for every state in which a national bank maintains a branch,
16 that "the definition of 'located' is limited to the national bank's principal place of business and the
17 state listed in its organization certificate and its articles of association." *Id.* at 432-36.

   *Firstar* and *Horton* are consistent with *Schmidt* and support the validity of the Ninth
19 Circuit's holding in *American Surety*. On the other hand, in *WMR e-Pin* the Eighth Circuit found
20 that language of jurisdictional parity had been progressively stripped from the law from 1887 to
21 1948, thereby suggesting that Congress did not intend § 1348 to continue to be anchored to the
22 evolving definition of corporate citizenship, but rather to be frozen at the then prevailing
23 understanding of corporate citizenship in 1948 when citizenship was based solely on the state of
24 incorporation. *See* 653 F.3d at 708-09. *WMR e-Pin* thus concluded that the expansion of principal
25 place of business test for corporate citizenship in 1958 in § 1332 did not apply to § 1348. *See id.*
26 Moreover, the Court concluded its interpretation of § 1348 comported with the position of the Office
27 of the Comptroller of the Currency ("OCC"). *See id.* at 709-10.
28

However, *WMR e-Pin*'s analysis gives short shrift to the overarching policy of parity established by Congress and applied by federal courts from 1882 to the present; it also overstates the OCC's position on this issue. The Supreme Court has repeatedly reaffirmed jurisdictional parity at each stage of statutory evolution, notwithstanding removal of explicit references equating national to local banks for jurisdictional purposes. First, the 1882 Act indisputably established parity between national banks and their state counterparts. *See WMR e-Pin*, 653 F.3d at 706. Second, although the 1887 Act removed the direct comparison to state banks, instead comparing national banks to "individual citizens of the same State," the Court in *Mercantile National Bank at Dallas v. Langdeau*, 371 U.S. 555, 565-66 (1963), recognized that the 1887 Act, like the 1882 Act, was designed "to limit, with exceptions, the access of national banks to, and their suability in, the federal courts to the same extent to which non-national banks are so limited." Third, although the 1911 Act removed the clause comparing national banks to other entities entirely, leaving only the language that they "be deemed citizens of the States in which they are respectively located," the Supreme Court recognized in *Federal Intermediate Credit Bank of Columbia, S.C. v. Mitchell*, 277 U.S. 213, 216 (1928), that the 1911 Act "was in substance a reenactment of the earlier provisions in respect of . . . jurisdiction." *See also Hermann v. Edwards*, 238 U.S. 107, 117-18 (1915). The 1948 Act did not substantively change the language regarding national bank citizenship, leaving intact the language that courts, including *American Surety*, had employed since 1887 to apply jurisdictional parity to national banks.

As for the question of whether that policy of parity to remain static as of 1948 and unmoored to any evolution in the development of corporate or local bank citizenship, the Supreme Court's opinion in *Schmidt* is telling; *Schmidt* itself applied contemporary parity in its analysis of § 1348, repeatedly comparing national banks to corporations and state banks. *Schmidt* did not base its decision based on a comparison with corporate citizenship in 1948; rather, it compared national banks to corporations in the present-tense, for example, by using such language as "a corporation's citizenship *derives*" and "[i]t *is* not deemed a citizen of every State in which it conducts business" *See* 546 U.S. at 318 (emphasis added). As discussed above, it repeatedly invoked language suggestive of the continued vigor of a jurisdictional parity analysis. *See id.* at 307 ("comparison to"

13

state banks and other state incorporated entities); *id.* at 316-17 (venue for national banks "aligned" with state banks and corporations); *id.* at 317 (national banks "compared to" corporations generally); *id.* at 319 (expressing concern that national banks would be"singularly disfavored" compared to other corporations if subjected to rule creating citizenship in every state with a branch).

In fact, as recognized in *Schmidt*, the term "located," as used in § 1348, has no fixed meaning. *See* 546 U.S. at 313-14. Thus, Congress, from 1887 to 1948, repeatedly imbued § 1348 and its predecessors with the flexibility to adapt to prevailing rules for determining corporate jurisdiction. The language of § 1348 and its predecessor in 1887 and 1911 – "in which they are respectively located" – is not static (as would be if the statute simply stated, *e.g.*, "the location of the bank's main office") but elastic enough to incorporate evolving changes in the law. Contrary to *WMR e-Pin*'s analysis, § 1348 had the flexibility to incorporate changes to corporate citizenship in order to maintain parity, including changes in 1958 to § 1332. *See Firstar*, 253 F.3d at 994 n.5. Thus, nothing in the language of § 1348 suggests Congress intended to depart from the sixty year policy of jurisdictional parity.

In addition, as a matter of statutory construction, the Court notes that as of 1948, *American Surety* was the only appellate opinion directly to consider the meaning of the term "located," as used in § 1348's predecessor statute. *See WMR e-Pin*, 653 F.3d at 716 (Murphy, J., dissenting). "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978) (citations omitted). "So too, where, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute." *Id.* at 581. Thus, it may be presumed that Congress, by reincorporating the language from the 1911 act construed by *American Surety* into § 1348, thereby incorporated *American Surety*'s holding that a national bank has citizenship in its principal place of business. Significantly, at no point did Congress disavow *American Surety* or the Supreme Court's repeated application of jurisdictional parity between national banks and their state-chartered counterparts. *See, e.g.*, *Leather Mfrs.' Nat'l Bank v. Cooper*, 120 U.S. 778, 780 (1887); *Petri v. Commercial Nat'l Bank*, 142 U.S. 644, 650-51

(1892); *Herrmann v. Edwards*, 238 U.S. 107, 117-18 (1915); *Fed. Intermediate Credit Bank of Columbia, S.C. v. Mitchell*, 277 U.S. 213, 215-16 (1928).

Finally, the contention in *WMR e-Pin* that its conclusion comports with the position of the OCC is undermined by the existence of contradictory policy positions taken by the OCC. The majority opinion in *WMR e-Pin* selectively quoted from the OCC's argument at the Supreme Court hearing in *Schmidt* wherein counsel for the OCC stated he did not "think that a national banking association is a citizen of a State in which its principal place of business is found, insofar as that might be different from the State in which its main office is located." *See* 653 F.3d at 709-10 (quoting Oral Argument at 18:22, *Schmidt*, 546 U.S. 303 (No. 04-1186), *available at* http://www.oyez.org/cases/2000-2009/2005/2005_04_1186/argument ("Oral Arg.")). However, as pointed out by the dissent in *WMR e-Pin*, counsel for the OCC equivocated on this position at the hearing, noting several times that it was "not an open and shut case" and that the Supreme Court, "in a case that specifically raised the issue[,] . . . could construe 1332(c) . . . as also applying to national banking associations[.]" *Id.* at 718-19 (Murphy, J., dissenting) (quoting Oral Arg.). Moreover, as pointed out by the dissent in *WMR e-Pin*, the OCC had previously issued formal, written opinions recognizing both the state of association and the principal place of business as places where national banks are located. *See* Office of the Comptroller of the Currency, Interp. Ltr. No. 952, at 6 (Oct. 23, 2002), *available at* http://www.occ.gov/static/interpretations-and-precedents/feb03/int952.pdf; Amicus Br., *Horton v. Bank One, N.A.*, No. 03-50865, 2003 WL 25953465, at *3 (5th Cir. Nov. 24, 2003). Given OCC's equivocation and earlier embrace of a contrary view, *WMR e-Pin*'s reliance on the argument of the OCC before the Supreme Court in *Schmidt* is unpersuasive.

C.      Principal Place of Business Legislative History

As the Supreme Court recognized in *Schmidt*, the term "located" is not a word of "enduring rigidity" with fixed meaning; it is ambiguous. 546 U.S. at 306. Hence, its is appropriate to consult legislative history in ascertaining its meaning.

Wells Fargo argues that legislative history behind the enactment of principal place of business citizenship for corporations in 1958 demonstrates Congressional intent to sever the

jurisdictional parity theretofore applied between national banks and corporations. *See* Def.'s Supp. Br., Docket No. 22. In particular, Wells Fargo relies on comments buried in 1958 committee reports for the House and Senate describing deliberations in 1932 and 1945 over corporate citizenship. *See* Def.'s Supp. Br., Docket No. 22, at 4-11. Both reports contain identical language from the Judicial Conference of the United States' Committee on Jurisdiction and Venue stating that

> The problem [of diversity jurisdiction] was discussed at length in hearings held in 1932 in reference to bills then pending in the Senate to limit Federal jurisdiction. The view of the then Attorney General, William D. Mitchell, of other practicing lawyers and of witnesses for *insurance companies, banking institutions, and other business litigants* was to the effect that there are occasions and places where prejudice against a nonresident is an influential factor in the determination of a case and that the right to have a case tried in a Federal court is still essential for the proper administration of justice.

*See* H.R. Rep. No. 85-1706, at 15 (1958) (emphasis added); S. Rep. No. 85-1830 (1958), at 18. Wells Fargo suggests that the language describing these groups of witnesses suggests that Congress intentionally dealt with diversity jurisdiction for three different groups of entities – insurance companies, national banks, and corporations – separately over the ensuing years. *See* Def.'s Supp. Br. 16-20. This implies Congress's intent to breach parity.

However, Wells Fargo's argument reads too much into this passage. A plain reading of the passage shows that it only describes the various witnesses who testified at Congressional hearings and does not suggest that Congress intended to systematically address in a discrete and separate manner each of these groups of entities.

In fact, what the passage describes as "banking institutions" does not even mean national banks. The primary "banking institution" witness in 1932 was an attorney for the Investment Bankers Association. *See Limiting Jurisdiction of Federal Courts: Hearing on H.R. 10594, H.R. 4526, and H.R. 11508 Before the H. Comm. on the Judiciary*, 72d Cong. 52 (1932) ("House Hearing"); *Limiting Jurisdiction of Federal Courts: Hearings on S. 937, S. 939, and S. 3243 Before the S. Subcomm. of S. Comm. on the Judiciary*, 72d Cong. 49 (1932) ("Senate Hearing"). The hearing transcripts show no distinction between national banks and other banking institutions. In fact, the witness from the Investment Bankers Association noted that his organization consisted of "individuals and financial houses engaged in the business of buying investment securities," and

16

1  included "corporations [and] banks with bond departments." *See* House Hearing 52. Thus, there is
2  no support for Wells Fargo's suggestion that the reference to "banking institutions" in 1958
3  indicated that Congress contemplated that national banks were to be treated differently from any
4  other banking institution.

5  Moreover, legislative history does not support Wells Fargo's suggested sequence of events.
6  Wells Fargo argues that, following the 1932 deliberations, Congress dealt with banking institutions
7  first, in 1948, when it enacted § 1348, after which it prescribed corporate citizenship in 1958 and
8  insurer citizenship in 1964. *See* Def.'s Supp. Br. 11. However, as discussed above, the enactment of
9  § 1348 did not substantively change the language regarding citizenship of national banks. Rather, it
10 simply restated language first adopted in 1887 providing that national banks "shall . . . be deemed
11 citizens of the States in which they are respectively located." Thus, Wells Fargo's suggestion that
12 the enactment of § 1348 was part of a deliberate and coherent scheme to address diversity
13 jurisdiction for national banks as a discrete group from 1932 on is not supported.

14 In short, nothing in the legislative history behind § 1332(c)(1) evidences Congressional
15 intent to depart from the application of jurisdictional parity to national banks.

16 D.     Policy

17 Assigning citizenship to a national bank's principal place of business makes eminent sense
18 with respect to the basic policy concerns which generally underpin diversity jurisdiction.
19 "[D]iversity jurisdiction's basic rationale" is to "open[] the federal courts' doors to those who might
20 otherwise suffer from local prejudice against out-of-state parties." *Hertz Corp. v. Friend*, 130 S. Ct.
21 1181, 1188 (2010). A national bank is least likely to suffer local prejudice where its principal place
22 of business is located. Wells Fargo does not contend it is likely to suffer from local prejudice as an
23 out-of-state party in California.

24 Furthermore, it should be noted that the same policy rationale that animated the corporate
25 test of jurisdiction of § 1332(c)(1) in 1958 applies to national banks. Section 1332(c)(1) was passed
26 in part to curtail "frauds and abuse" under the then-existing rule for corporate citizenship, which was
27 based only on the state of incorporation, allowing a corporation to "open[] the federal courts' doors
28 in a State where it conducted nearly all its business by filing incorporation papers elsewhere." *Hertz*

17

1  *Corp. v. Friend*, 130 S. Ct. 1181, 1188-89 (2010). That policy would operate with equal force to
2  national banks. The articles of association of a national bank can designate its main office in a
3  particular state just as a corporation can choose its state of incorporation. In either case, this can be
4  done in a manner that is divorced from economic and operational reality, which facilitates venue
5  shopping which § 1332(c) intended to minimize.[5]

6  E.     Federal Savings Associations

7  Wells Fargo also suggests that Congressional enactment of 12 U.S.C. § 1464(x) in 2006,
8  which governed the citizenship of Federal savings associations, evidenced Congress's intent that
9  national banks be treated as citizens only of their states of association. *See* Def.'s Supp. Br. 18-19.
10 12 U.S.C. § 1464(x) provides that a "Federal savings association shall be considered a citizen only
11 of the State in which such savings association has its home office." Wells Fargo suggests that this
12 law demonstrates Congressional intent that a national bank should also only be a citizen of the state
13 in which its home office is located. However, there is no textual support for this interpretation.
14 Wells Fargo is a national bank, not a Federal savings association. National banks and Federal
15 savings associations are subject to different rules and regulations. *See generally* Office of the
16 Comptroller of the Currency, Key Differences Between National Bank Regulatory Requirements
17 and Federal Savings Association Regulatory Requirements, *available at*
18 http://www.occ.treas.gov/publications/publications-by-type/other-publications-reports/Key-differenc
19 es-document-public.pdf (last visited May 14, 2013). Wells Fargo does not point to any law
20 requiring that national banks and Federal savings associations be treated similarly for purposes of
21 diversity jurisdiction. In fact, as noted above, national banks have traditionally been compared to

---

[5] The Court notes that Wells Fargo recently moved its headquarters from San Francisco, California to Sioux Falls, South Dakota in 2004, while its parent company, Wells Fargo & Company, maintains its headquarters in San Francisco. *See* FDIC-Insured Subsidiaries of Bank Holding Companies, Wells Fargo & Company, *available* at http://www2.fdic.gov/idasp/main.asp (last visited May 15, 2013) (click "Bank Holding Companies," search for "Wells Fargo" in "BHC Name" field, click on "Wells Fargo & Company," click on "3511," click on "Generate History"). *See id.* It seems unlikely that Sioux Falls, South Dakota would be the nerve center from which Wells Fargo conducts its business, particularly where as here, it is undisputed that Wells Fargo's principal place of business is California. While the Court does not attribute any particular motive to Wells Fargo's move in 2004, the facts here illustrate that even large national banks can move their designated main office.

1 corporations and state banks for purposes of determining citizenship, *not* Federal savings
2 associations. *See Langdeau*, 371 U.S. at 565-66 (predecessor statute to § 1348 sought to limit the
3 access of national banks to federal courts to the same extent as non-national banks); *Schmidt*, 546
4 U.S. at 317-19 (comparing national banks to corporations and state banks); *see also Taheny*, 878 F.
5 Supp. 2d at 1109 (12 U.S.C. § 1464(x) is "not relevant" to the meaning of "located" in § 1348).
6 Wells Fargo has not cited any legislative history, policy and judicial precedent suggesting that
7 Federal savings associations should be equated to national banks for jurisdictional purposes. Thus,
8 Wells Fargo's argument regarding 12 U.S.C. § 1464(x) is of no avail.

F. <u>Summary</u>

In sum, the Court finds Wells Fargo to be a citizen of California, its principal place of business. This destroys complete diversity in this case. Thus, the Court **GRANTS** Plaintiffs' motion to remand.

G. <u>Fee Request</u>

Plaintiffs' motion to remand seeks attorney fees and costs incurred as a result of the removal. Mot. to Remand 8. 28 U.S.C. § 1447(c) provides that "[a]n order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." However, the Supreme Court has held that attorney fees should be granted "only where the removing party lacked an objectively reasonable basis for seeking removal." *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005). Here, Wells Fargo had reasonable grounds for pursuing removal, as numerous courts have found national banks to be citizens of only their state of association. Thus, the Court **DENIES** Plaintiffs' fee request.

///
///
///
///
///
///
///

19

### IV. CONCLUSION

In sum, the Court finds that Defendant Wells Fargo is a citizen of both its state of association and its principal place of business. As its principal place of business is in California, diversity jurisdiction is lacking. Thus, the Court **GRANTS** Plaintiffs' motion to remand. The Court **DENIES** Plaintiffs' request for fees and costs. In addition, as the Court lacks jurisdiction over this case, it **DENIES** Defendant's motion to dismiss as moot.

This order disposes of Docket Nos. 4 and 14.

IT IS SO ORDERED.

Dated: May 21, 2013

_____
EDWARD M. CHEN
United States District Judge