**United States District Court**
For the Northern District of California

1

2

3

4

5                   UNITED STATES DISTRICT COURT

6                   NORTHERN DISTRICT OF CALIFORNIA

7

8   RAUL MARTINEZ, *et al.*,                    No. C-12-6006 EMC

9                   Plaintiffs,

10          v.                                  **ORDER GRANTING PLAINTIFFS'**
                                                **MOTION TO REMAND; AND**
11  WELLS FARGO BANK,                           **DENYING DEFENDANT'S MOTION TO**
                                                **DISMISS AS MOOT**
12                  Defendant.
    _____/       **(Docket Nos. 4, 14)**

13

14

15                      I.   **INTRODUCTION**

16          At issue is whether, for purposes of diversity jurisdiction, a national bank is a citizen solely

17  of the state in which its main office is located, as identified in its articles of association (the "state of

18  association"), or is also a citizen of the state in which its principal place of business is located.

19  Plaintiffs Raul Martinez and Martha L. Miranda initially brought this action in state court against the

20  successor in interest to the lender for their property at 327 Foerster Street, San Francisco, California

21  (the "Property"), Defendant Wells Fargo Bank, N.A. ("Wells Fargo"), based on Defendant's conduct

22  surrounding issuance and servicing of the note for the Property.  *See* Compl., Docket No. 1 Ex. A.

23  Plaintiffs assert state law claims for (1) violation of California Business & Professions Code section

24  17200 (the "UCL" claim) based on unfair conduct and fraudulent conduct; (2) fraud; (3) negligent

25  misrepresentation; and (4) breach of the implied covenant of good faith and fair dealing.  *See* Compl.

26  After Defendant removed the case to this Court on the basis of diversity jurisdiction, it brought the

27  instant motion to dismiss.  *See* Mot. to Dismiss, Docket No. 4.  Plaintiff brought the instant motion

28  to remand.  *See* Mot. to Remand, Docket No. 14.  As the Court finds Defendant to be a citizen of

1    California, diversity jurisdiction is lacking, and thus the Court **GRANTS** Plaintiff's motion for

2    remand.  Defendant's motion to dismiss is **DENIED** as moot.

3                           **II.    FACTUAL & PROCEDURAL BACKGROUND**

4        This case stems from an adjustable rate mortgage note for $532,800 (the "Note") obtained by

5    Plaintiffs in March 2005.  *See* Compl. ¶¶ 17, 19, Ex. 2.[1]  Plaintiffs are Spanish speakers with limited

6    ability to read, speak, and understand English.  *Id.* ¶ 44.  Plaintiffs obtained the loan through loan

7    broker Infinity Financial Consultants Inc. ("Infinity") and John Balladeres (collectively, "the

8    Brokers"), neither of which are defendants in the current action.  *See id.* ¶¶ 3, 52-54.  Defendant

9    Wells Fargo is a national bank with the main office identified in its articles of association in South

10   Dakota, but its principal place of business in California.  *See* Remand RJN, Docket No. 19, Ex. 5 art.

11   II, ¶ 1;[2] Mot. to Remand 4 (arguing Wells Fargo's principal place of business is in California);

12   Def.'s Opp'n to Mot. to Remand ("Def.'s Opp'n"), Docket No. 18 (not disputing assertion that

13   California is principal place of business).

14       Plaintiffs' claims are based on two general sets of allegations.  First, the bulk of the

15   complaint is devoted to Plaintiffs' allegations that Wells Fargo and the Brokers took part in various

16   deceptive practices that induced Plaintiffs to sign the Note, such as failing to disclose that the loan

17   was designed to cause negative amortization to occur, failing to disclose that the initial interest rate

18   was only temporary, and failing to disclose that unpaid interest would be added to the principal of

19   the loan.  *See* Compl. ¶¶ 66 (UCL claim), 88 (fraud claim), 102-05 (negligent misrepresentation

20   claim), 119 (breach of covenant claim).  The Brokers and Wells Fargo represented "that their

21   minimum monthly payments would pay off the balance of the loan during their negotiations with

22   Plaintiffs . . . ."  *Id.* ¶¶ 30, 46.  No one explained any of the loan documents to Plaintiffs in Spanish

23

24       [1]  The Court takes judicial notice of the documents attached to Plaintiffs' complaint, which
         are the deed of trust for the Property (Ex. 1) and the Note (Ex. 2).  *See U.S. v. Corinthian Colleges*,
25       655 F.3d 984, 999 (9th Cir. 2011) (court may "consider materials that are submitted with and
         attached to the Complaint" in considering Rule 12(b)(6) motion).
26

27       [2]  The Court takes judicial notice of Defendant's certified articles of association as a
         document that is in the public record and subject to verification.  *See Fernandez v. Wells Fargo*
28       *Bank, N.A.*, No. C-12-3941 NC, 2012 WL 5350256, at *1 (N.D. Cal. Oct. 29, 2012) (taking judicial
         notice of same document).

United States District Court

For the Northern District of California

and none of the documents were presented to Plaintiffs in advance. *Id.* ¶ 33. As a result of these representations and omissions, Plaintiffs executed the Note. *Id.* ¶ 31. Plaintiffs did not realize that the representations made at the time they executed the Note were false until November 2011, when they sought advice in an attempt to modify their loan with a fixed interest rate. *Id.* ¶ 43.

Second, although not discussed in the facts section of the complaint, Plaintiffs' UCL and breach of covenant causes of action include allegations that Wells Fargo has "assessed improper or excessive late fees"; "improperly characterized Plaintiffs' account as being in default or delinquent status to generate unwarranted fees"; "misapplied, or failed to apply Plaintiffs' payments"; tried to collect and/or collected various improper fees, costs and charges." Compl. ¶¶ 68, 121.

In arguing whether there is diversity jurisdiction, the parties contest the citizenship of Wells Fargo. At the hearing on this matter on January 31, 2013, the Court ordered the parties to submit supplemental briefing detailing the legislative history behind adoption of the principal place of business standard in 1958, which the parties filed on April 1, 2013. *See* Docket Nos. 20-23.

### III.  MOTION TO REMAND

A.  Statutory Backdrop

In order for this Court to retain jurisdiction over the case, there must be complete diversity between the parties. *See* 28 U.S.C. § 1441(b). Normally, corporate citizenship is governed by 28 U.S.C. § 1332(c)(1), which provides that a corporation is a citizen of both its state of incorporation and, since 1958, the state in which its principal places of business is located. However, national banks,[3] such as Wells Fargo, are subject to a separate jurisdiction provision, 28 U.S.C. § 1348 ("§ 1348"), which provides, in full, that

> The district courts shall have original jurisdiction of any civil action commenced by the United States, or by direction of any officer thereof, against any national banking association, any civil action to wind up the affairs of any such association, and any action by a banking association established in the district for which the court is held, under chapter 2 of Title 12, to enjoin the Comptroller of the Currency, or any receiver acting under his direction, as provided by such chapter.

---

[3] National banks are "corporate entities chartered not by any State, but by the Comptroller of the Currency of the U.S. Treasury." *Wachovia Bank v. Schmidt*, 546 U.S. 303, 306 (2006).

*All national banking associations shall, for the purposes of all other actions by or against them, be deemed citizens of the States in which they are respectively located.*

28 U.S.C. § 1348 (emphasis added).  However, the statute does not define where national banks are "located" for purposes of jurisdiction, nor is such a definition obvious.

B.    Case Law Regarding National Bank Citizenship

Courts have struggled to interpret the last phrase in § 1348.  *Compare World Trade Center Properties, L.L.C. v. Hartford Fire Ins. Co.*, 345 F.3d 154 (2d Cir. 2003) (a national bank is "a citizen of every state in which it has offices."), *abrogated by Wachovia Bank v. Schmidt*, 546 U.S. 303, 309 (2006), *with Firstar Bank, N.A. v. Faul*, 253 F.3d 982, 993 (7th Cir. 2001) (national banks are "located" in "the state where the bank's principal place of business is found and the state listed on its organization certificate."), *and with Wells Fargo Bank, N.A. v. WMR e-Pin, LLC*, 653 F.3d 702, 709 (8th Cir. 2011) (a national bank is "located" only in the state of its main office).

In *Wachovia Bank v. Schmidt*, 546 U.S. 303, 307 (2006), the Supreme Court rejected an interpretation of § 1348 that national banks are citizens of every state in which they have a branch and instead determined "that a national bank, for § 1348 purposes, is a citizen of the State in which its main office, as set forth in its articles of association, is located."  However, the Court did not reach the question of whether a national bank may *also* be a citizen of the state in which its principal place of business is located, specifically leaving that question unresolved.  *See id.* at 317 n.9. *Schmidt* left open the door to either of two interpretations, that a national bank is a citizen of:  (1) only its state of association (the state in which its main office is listed in its articles of association); or (2) both its state of association and the state in which its principal place of business is located. *See WMR e-Pin*, 653 F.3d at 707 (*Schmidt* did not consider whether a national bank is also a citizen of the state of its principal place of business).  The Court turns to the reasoning in *Schmidt*, the various lower court cases that have considered this issue, and legislative history and legislative policy underlying § 1348 and related statutes to determine which of these two interpretations is correct.

///

///

4

1. _Schmidt_

In *Schmidt*, the lower court had found that a national bank is a citizen of every state in which it has established a branch. *See* 546 U.S. at 307. The Supreme Court rejected that interpretation and instead found that national banks are citizens of their states of association. In so holding, *Schmidt* first looked to the legislative history behind § 1348. As set forth in *Schmidt*, Congress authorized national banks in 1863, providing that suits in which a national bank was a party could automatically be brought in all federal courts. *See id.* at 309-10 (citing Act of Feb. 25, 1863, § 59, 12 Stat. 681). In contrast, state banks and other state-incorporated entities could only access federal courts on the basis of diversity of citizenship or federal question jurisdiction. *See id.* at 310.

National banks' automatic qualification for federal jurisdiction ended in 1882, when Congress passed a bill providing for jurisdictional parity with state-chartered banks, such that jurisdiction would be "the same as, and not other than, the jurisdiction for suits by or against" state banks from the state where national banks were doing business. *See id.* (quoting Act of July 12, 1882, § 4, 22 Stat. 163). Congress thus established parity between national and local banks for purposes of jurisdiction.

In 1887, Congress again revised the law governing national banks, inserting, for the first time, the current language defining where a national bank was "located" for diversity purposes:

> [A]ll national banking associations established under the laws of the United States shall, for the purposes of all actions by or against them, real, personal or mixed, and all suits in equity, *be deemed citizens of the States in which they are respectively located*; and in such cases the circuit and district courts shall not have jurisdiction other than such as they would have in cases between individual citizens of the same State.

*See id.* at 310-11 (quoting Act of Mar. 3, 1887, § 4, 24 Stat. 554-55 (the "1887 Act")) (emphasis added by *Schmidt*). Despite the removal of language explicitly equating national banks to state banks for jurisdictional purposes, the 1887 Act still "'sought to limit . . . the access of national banks to, and their suability in, the federal courts *to the same extent* to which non-national banks [were] so limited.'" *Id.* at 311 (quoting *Mercantile Nat'l Bank at Dallas v. Langdeau*, 371 U.S. 555, 565-66 (1963)) (emphasis added). *See also Fed. Intermediate Credit Bank of Columbia, S.C. v. Mitchell*, 277 U.S. 213, 215-16 (1928) ("national banks were by the acts of 1882 and 1887 put *on the same*

United States District Court
For the Northern District of California

*basis* in respect of jurisdiction as if they had not been organized under an act of Congress")
(emphasis added).  In short, in the 1887 Act, Congress retained parity between national and local
banks in accessing the jurisdiction of the federal courts.

In the Judicial Code of 1911, Congress combined two formerly discrete provisions regarding
national banks, but kept without revision the language adopted in 1887 indicating that national
banks would "be deemed citizens of the States in which they are respectively located."  *See Schmidt*,
546 U.S. at 311 (citing Act of Mar. 3, 1911, § 24 (Sixteenth), 36 Stat. 1091-93 (the "1911 Act"));
*see also Mitchell*, 277 U.S. at 216 (1911 Act was "in substance a re-enactment of the earlier
provisions in respect of such jurisdiction.").  Nothing suggests Congress intended to breach the
parity between national and local banks.

In 1948, Congress adopted the current statute governing national bank citizenship for
purposes of diversity, 28 U.S.C. § 1348.  Section 1348 maintains the same language for national
bank citizenship for purposes of diversity jurisdiction as contained in the predecessor acts of 1887
and 1911, providing that "[a]ll national banking associations shall, for the purposes of all other
actions by or against them, *be deemed citizens of the States in which they are respectively located*."
*See Schmidt*, 546 U.S. at 311-12 (citing Act of June 25, 1948, 62 Stat. 933) (emphasis added).
Notably, the Court in *Schmidt* did not find that the jurisdictional parity established in 1882 no longer
applied under § 1348.

After setting forth the historical development of § 1348 and then rejecting several rationales
for recognizing national bank citizenship based on every state in which a national bank has a branch,
the Court compared national banks to state banks and non-banking corporations to determine that
national banks are citizens of their states of association.  *See id.* at 313-17.  It noted that, unlike the
rule set forth in the appellate court's decision, "this Court's reading of the venue provision in
[*Citizens & Southern Nat'l Bank v.*] *Bougas* effectively *aligned* the treatment of national banks for
venue purposes with the treatment of state banks and corporations."  *Id.* at 316-17 (emphasis added).
The Court repeatedly expressed concern that treating national banks as citizens of every state in
which they conduct business would "render[] national banks singularly disfavored corporate bodies
with regard to their access to federal courts."  *Id.* at 319; *see also id.* at 307 ("access of a federally

United States District Court

For the Northern District of California

1  chartered bank to a federal forum would be drastically curtailed *in comparison to* the access afforded

2  state banks and other state incorporated entities" if national banks were found to be citizens of every

3  state with a branch) (emphasis added); *id.* at 317 (such a reading "severely constricts national banks'

4  access to diversity jurisdiction as *compared to* the access available to corporations generally")

5  (emphasis added).  Nowhere does it suggest that national banks should be treated as only citizens of

6  their states of association, which would effectively render them "singularly []*favored* corporate

7  bodies with regard to their access to federal courts."  (Emphasis added.)  Thus, while the Court did

8  not address the precise issue raised in the instant case, the analytical thrust behind the Supreme

9  Court's holding in *Schmidt* was to preserve parity between national banks on the one hand, and local

10 banks and corporations on the other.

      In footnote nine of its opinion, the Court did highlight the difference between the language

12 used to grant diversity jurisdiction over a corporation under 28 U.S.C. § 1332 – that it "shall be

13 deemed to be a citizen of any State by which it has been incorporated and of the State where it has

14 its principal place of business" – and national banks under § 1348 which are "citizens of the States

15 in which they are respectively located" noting the latter does not mention principal place of

16 business.  *Id.* at 317 n.9.  However, the Court did not conclude that the difference in language was

17 meant to overturn a decades long policy of jurisdictional parity.  Rather, the Court refrained from

18 deciding an issue not before it, recognizing that "[t]he absence of a 'principal place of business'

19 reference in § 1348 may be of scant practical significance for, in almost every case, as in this one,

20 the location of a national bank's main office and of its principal place of business coincide."  *Id.*

21        2.        Ninth Circuit Precedent

22       Prior to *Schmidt*, the Ninth Circuit held in *American Surety Co. v. Bank of California*, 133

23 F.2d 160, 162 (9th Cir. 1943), that "the 'States in which they (national banking associations) are

24 respectively located' are those states in which their principal places of business are maintained" and

25 thus "[t]he trial court was right in holding that defendant is a citizen only of the state in which its

26 principal place of business is located."  The statute at issue contained the same language as currently

27 in § 1348.  Thus, literally read, *American Surety*, if still good law, is binding on this Court and

28 resolves the question left open in *Schmidt*.  Moreover, apart from its specific holding, the central

United States District Court

For the Northern District of California

1    teaching of *American Surety* is its reliance on "a close analogy between [a national] bank and a

2    corporation national in scope," *i.e.* parity.  *Id.* at 162.  That teaching is consistent with *Schmidt*.

3          Importantly, *American Surety* has not been overruled by any subsequent opinion of the Ninth

4    Circuit.  In fact, the Ninth Circuit has twice cited *American Surety* with approval.  *See U.S. Nat'l*

5    *Bank v. Hill*, 434 F.2d 1019, 1020 (9th Cir. 1970); *Bank of Cal. Nat'l Ass'n v. Twin Harbors Lumber*

6    *Co.*, 465 F.2d 489, 492 (9th Cir. 1972).

7          Wells Fargo advances several arguments for avoiding *American Surety*'s holding that

8    principal place of business may serve as grounds for a national bank's citizenship:  (1) that *Schmidt*

9    and *American Surety* each advance exclusive tests for national bank citizenship, and are thus

10   irreconcilable; (2) that *American Surety* did not consider the National Bank Act for examples of how

11   "located" is used and is thus no longer good law on this point; (3) that *American Surety* did not

12   consider whether a national bank could be a citizen of a state where its principal place of business is

13   located in addition to a state where its main office is located; (4) that the analogy to corporations in

14   *American Surety* was necessary only due to the lack of case law defining "located"; and (5) that

15   *American Surety* relied on a misstatement of the law.  *See* Def.'s Opp'n 8-10.

16         The Court finds *American Surety* remains good law in this Circuit.  In *Taheny v. Wells Fargo*

17   *Bank, N.A.*, 878 F. Supp. 2d 1093 (2012), Judge Karlton's extensive and well reasoned opinion

18   disposed of the first argument, finding that *American Surety* remained good law.  As pointed out by

19   *Taheny*, "'where intervening Supreme Court authority is clearly irreconcilable with . . . prior circuit

20   court authority . . .[,] district courts should consider themselves bound by the intervening higher

21   authority and reject the prior opinion of [the circuit court] as having been effectively overruled.'"

22   *Id.* at 1100 (quoting *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc)).  Unless

23   *Schmidt* is "clearly irreconcilable with *American Surety*, the latter still binds this Court.  The two

24   decisions are not clearly irreconcilable.  As *Taheny* found, "*Schmidt* and *American Surety* each

25   identify a different possibility for citizenship – main office or principal place of business – without

26   excluding the other possibility."  *Id.* at 1100.  In fact, both opinions reached their conclusions by

27   rejecting the interpretation that a national bank could be a citizen of every state in which it maintains

28   a branch.  *See id.*  In so holding, *Schmidt* left open the possibility that a national bank could be

United States District Court

For the Northern District of California

1  deemed a citizen of the state of its principal place of business, a result consistent with *American*

2  *Surety*.  *American Surety* likewise did not rule out the possibility that citizenship could be located in

3  the state of the national bank's main office as *Schmidt* held – that question was not presented in

4  *American Surety*.[4]

5  　　　　The Court likewise concludes *American Surety* remains binding precedent and joins the

6  ranks of an increasing number of courts within the Ninth Circuit so holding.  *See, e.g., Adams v.*

7  *Wells Fargo Bank, N.A.*, No. C-13-0256 MCE, 2013 WL 1907746, at *2 (E.D. Cal. May 7, 2013);

8  *Ortiz v. Wells Fargo Bank, N.A.*, No. C-13-0060 GPC, 2013 WL 1702790, at *4 (S.D. Cal. Apr. 19,

9  2013); *Grace v. Wells Fargo Bank, N.A.*, No. C-12-2050 GPC, 2013 WL 663169, at *4 (S.D. Cal.

10  Feb. 21, 2013); *Bickoff v. Wells Fargo Bank, N.A.*, No. C-11-2452 BEN, 2013 WL 100323, at *4 n.4

11  (S.D. Cal. Jan. 4, 2013); *Cesar v. Wells Fargo Bank, N.A.*, No. C-12-1614 MCE, 2012 WL 5289332,

12  at *2 (E.D. Cal. Oct. 23, 2012); *Gosal v. Wells Fargo Bank, N.A.*, No. C-12-2024 GEB, 2012 WL

13  4961696, at *1 (E.D. Cal. Oct. 15, 2012); *Hun Gim v. Wells Fargo Home Mortg. Inc.*, No. C-12-

14  5686 DDP, 2012 WL 3848659, at *1 (C.D. Cal. Sept. 5, 2012); *Shirk v. Wells Fargo Bank, N.A.*, No.

15  C-12-1118 IEG, 2012 WL 6951901, at *1-2 (S.D. Cal. July 17, 2012); *Singer v. Wells Fargo Bank,*

16  *N.A.*, No. C-12-801 JVS, 2012 WL 2847790, at *3-5 (C.D. Cal. July 11, 2012); *Rodriguez v. Wells*

17  *Fargo Bank, Nat'l Ass'n*, No. C-12-469 BEN, 2012 WL 1940572, at *4 n.4 (S.D. Cal. May 25,

18  2012).

19  　　　　As *American Surety* has not been overruled by the Supreme Court or the Ninth Circuit, Wells

20  Fargo's remaining arguments suggesting that *American Surety* was wrongly decided are inapposite.

21  Even if the Court were to entertain these arguments on the merits and disregard the binding effect of

22  *American Surety*, Wells Fargo's arguments are not persuasive.  As for Wells Fargo's argument that

23  *American Surety* failed to consider the National Bank Act (which establishes, *e.g.*, venue for suits

24  involving national banks), any such failure is immaterial.  Although the National Bank Act uses

25  "located" to mean "the site of the banking association's designated main office" and "refers to or

26  includes branch offices," (but not principal place of business), as *Schmidt* pointed out, "the term

27  _____

28  　　　[4]  *Taheny* also examined independent reasons why *American Surety* remains good law.
Judge Karlton analysis is persuasive.

9

**United States District Court**
For the Northern District of California

1    'located,' as it appears in the National Bank Act, has no fixed, plain meaning."  546 U.S. at 313-14.

2    Moreover, § 1348 is found in the Judicial Code and Judiciary Act, not the National Bank Act; there

3    is no compelling basis for using the National Bank Act as an interpretive tool in analyzing § 1348.

4    *See Horton v. Bank One, N.A.*, 387 F.3d 426, 433-34, 435 (5th Cir. 2004).  Indeed, *Schmidt* held that

5    the National Bank Act's provision regarding venue cannot be read as *in pari materia* with § 1348's

6    prescription for jurisdiction.  546 U.S. at 315-16.

7         Wells Fargo has not explained why it is material that *American Surety* did not consider

8    whether a national bank could be a citizen of both its state of association and the state in which its

9    principal place of business is located.  The court in *American Surety*, like in *Schmidt*, was presented

10   with a situation wherein the national bank's principal place of business and main office were located

11   in the same state.  *See American Surety Co. of N.Y. v. Bank of Cal.*, 44 F. Supp. 81, 82 (D. Or. 1941)

12   (underlying case).  As in *Schmidt*, the court in *American Surety* rejected the argument that a national

13   bank could be a citizen of every state in which it maintained a branch office.  There was no occasion

14   to consider whether a national bank may also be a citizen of its state of association.

15        Wells Fargo argues that the reasoning of *American Surety* was flawed because it analogized

16   banks to corporations for jurisdiction purposes at a time when there was then no case law on national

17   bank citizenship; *Schmidt* subsequently provided clear guidance not available to the Ninth Circuit in

18   *American Surety*.  Wells Fargo's argument is unpersuasive.  *Schmidt* and other cases have made

19   clear that Congress intended to maintain parity between national banks and non-banking

20   corporations, a result entirely consistent with *American Surety*.  *See* 546 U.S. at 316-17.  As noted

21   above, *Schmidt* and *American Surety* are not inconsistent; *Schmidt* acknowledged case law

22   interpreting § 1348 as setting the principal place of business as a national bank's citizenship (*i.e.*,

23   *Horton* and *Firstar*) and left that question open.  546 U.S. 317 n. 9.

24        To be sure, there is some support for Wells Fargo's fifth argument, that, at the time *American*

25   *Surety* was decided, it wrongfully assumed that corporate citizenship was based on principal place of

26   business.  *See* Def.'s Opp'n 10.  As explained by the Supreme Court recently in *Hertz Corp. v.*

27   *Friend*, "[i]n 1928 this Court made clear that the 'state of incorporation' rule was virtually absolute"

28   such that "a corporation closely identified with State A could proceed in a federal court located in

United States District Court

For the Northern District of California

1    that State as long as the corporation had filed its incorporation papers in State B, perhaps a State

2    where the corporation did no business at all."  130 S. Ct. 1181, 1188 (2010) (citing  *Black and White*

3    *Taxicab & Transfer Co. v. Brown and Yellow Taxicab & Transfer Co.*, 276 U.S. 518, 522-525

4    (1928)).  Thus, the conclusion in *American Surety* that "[t]he citizenship of a corporation is fixed by

5    its principal place of business," appears to have been a misstatement of the law at the time.

6    However, regardless of whether *American Surety* correctly identified the test for determining

7    corporate citizenship as of 19483, the thrust of its analysis was predicated on jurisdictional parity

8    between national banks and corporations; that rational was correct and consistent with *Schmidt*.  The

9    central teaching of *American Surety* remained in tact even after *Schmidt*.

10            3.    Other Circuit Court Authority

11            Aside from the Ninth Circuit in *American Surety*, three other circuits have addressed the

12    question of national bank citizenship:  the Fifth, Seventh, and Eighth Circuits.  *See Firstar Bank,*

13    *N.A. v. Faul*, 253 F.3d 982 (7th Cir. 2001); *Horton v. Bank One, N.A.*, 387 F.3d 426 (5th Cir. 2004);

14    *Wells Fargo Bank, N.A. v. WMR e-Pin, LLC*, 653 F.3d 702 (8th Cir. 2011).  Of these opinions, both

15    the Seventh Circuit's opinion in *Firstar* and then the Fifth Circuit's opinion in *Horton* set forth

16    persuasive arguments for recognizing both principal place of business and state of association as

17    bases for national bank citizenship.

18            In *Firstar Bank*, the Seventh Circuit applied the principle of jurisdictional parity in holding

19    that a national bank is a citizen of both the state in which its principal place of business is located

20    and its state of association.  After determining that the ordinary definition of "located" does not

21    provide a clear answer, it considered the subject matter to which it refers, national banks.  253 F.3d

22    at 987.  It concluded that "a national bank appears to be analogous in most respects to a corporation

23    rather than some other kind of business organization, and thus one would expect that 'located' in the

24    jurisdictional context means the same thing for a bank as it does for a corporation."  *Id.* at 988.

25    "While a national bank is not incorporated in a state, the organization certificate . . . serves a

26    function similar to a certificate of incorporation."  *Id.* at 993-94.  Next, it concluded that when §

27    1348 was enacted in 1948, there was a backdrop of sixty years of judicial interpretation assuming

28    "that national banks were to have the same access to the federal courts as state banks and

1   corporations," yet "[n]o language in the statute indicate[d] a rejection of this existing construction."

2   *Id.* at 988.  It directly confronted the argument against interpreting § 1348 in light of § 1332 (which

3   for the first time defined corporate citizenship to include principal place of business), enacted ten

4   years later in 1958; the court noted that "the 'classic judicial task of reconciling many laws enacted

5   over time, and getting them to 'make sense' in combination, necessarily assumes that the

6   implications of a statute may be altered by the implications of a later statute.'" *Id.* at 993 n.5

7   (quoting *U.S. v. Fausto*, 484 U.S. 439, 453 (1988)).

8          In *Horton*, the Fifth Circuit largely reiterated the reasoning from *Firstar*.  *See Horton*, 387

9   F.3d at 429.  It analyzed the history of national bank citizenship to determine "that Congress enacted

10  section 1348 against a backdrop of equal access to the federal courts for national banks, state banks,

11  and corporations" and, by not changing the statutory language from § 1348's predecessor, "intended

12  to retain and incorporate the existing interpretive backdrop." *Id.* at 430-31.  Then, it concluded that,

13  pursuant to application of such jurisdictional parity, a national bank, like a state bank, may have no

14  more than two possible states of citizenship.  *Id.* at 431.  Ultimately, it concluded, after rejecting

15  rationales for recognizing citizenship for every state in which a national bank maintains a branch,

16  that "the definition of 'located' is limited to the national bank's principal place of business and the

17  state listed in its organization certificate and its articles of association."  *Id.* at 432-36.

18         *Firstar* and *Horton* are consistent with *Schmidt* and support the validity of the Ninth

19  Circuit's holding in *American Surety*.  On the other hand, in *WMR e-Pin* the Eighth Circuit found

20  that language of jurisdictional parity had been progressively stripped from the law from 1887 to

21  1948, thereby suggesting that Congress did not intend § 1348 to continue to be anchored to the

22  evolving definition of corporate citizenship, but rather to be frozen at the then prevailing

23  understanding of corporate citizenship in 1948 when citizenship was based solely on the state of

24  incorporation.  *See* 653 F.3d at 708-09.  *WMR e-Pin* thus concluded that the expansion of principal

25  place of business test for corporate citizenship in 1958 in § 1332 did not apply to § 1348.  *See id.*

26  Moreover, the Court concluded its interpretation of § 1348 comported with the position of the Office

27  of the Comptroller of the Currency ("OCC").  *See id.* at 709-10.

28

United States District Court

For the Northern District of California

However, *WMR e-Pin*'s analysis gives short shrift to the overarching policy of parity established by Congress and applied by federal courts from 1882 to the present; it also overstates the OCC's position on this issue. The Supreme Court has repeatedly reaffirmed jurisdictional parity at each stage of statutory evolution, notwithstanding removal of explicit references equating national to local banks for jurisdictional purposes. First, the 1882 Act indisputably established parity between national banks and their state counterparts. *See WMR e-Pin*, 653 F.3d at 706. Second, although the 1887 Act removed the direct comparison to state banks, instead comparing national banks to "individual citizens of the same State," the Court in *Mercantile National Bank at Dallas v. Langdeau*, 371 U.S. 555, 565-66 (1963), recognized that the 1887 Act, like the 1882 Act, was designed "to limit, with exceptions, the access of national banks to, and their suability in, the federal courts to the same extent to which non-national banks are so limited." Third, although the 1911 Act removed the clause comparing national banks to other entities entirely, leaving only the language that they "be deemed citizens of the States in which they are respectively located," the Supreme Court recognized in *Federal Intermediate Credit Bank of Columbia, S.C. v. Mitchell*, 277 U.S. 213, 216 (1928), that the 1911 Act "was in substance a reenactment of the earlier provisions in respect of . . . jurisdiction." *See also Hermann v. Edwards*, 238 U.S. 107, 117-18 (1915). The 1948 Act did not substantively change the language regarding national bank citizenship, leaving intact the language that courts, including *American Surety*, had employed since 1887 to apply jurisdictional parity to national banks.

As for the question of whether that policy of parity to remain static as of 1948 and unmoored to any evolution in the development of corporate or local bank citizenship, the Supreme Court's opinion in *Schmidt* is telling; *Schmidt* itself applied contemporary parity in its analysis of § 1348, repeatedly comparing national banks to corporations and state banks. *Schmidt* did not base its decision based on a comparison with corporate citizenship in 1948; rather, it compared national banks to corporations in the present-tense, for example, by using such language as "a corporation's citizenship *derives*" and "[i]t *is* not deemed a citizen of every State in which it conducts business" *See* 546 U.S. at 318 (emphasis added). As discussed above, it repeatedly invoked language suggestive of the continued vigor of a jurisdictional parity analysis. *See id.* at 307 ("comparison to"

13

state banks and other state incorporated entities); *id.* at 316-17 (venue for national banks "aligned" with state banks and corporations); *id.* at 317 (national banks "compared to" corporations generally); *id.* at 319 (expressing concern that national banks would be"singularly disfavored" compared to other corporations if subjected to rule creating citizenship in every state with a branch).

In fact, as recognized in *Schmidt*, the term "located," as used in § 1348, has no fixed meaning. *See* 546 U.S. at 313-14. Thus, Congress, from 1887 to 1948, repeatedly imbued § 1348 and its predecessors with the flexibility to adapt to prevailing rules for determining corporate jurisdiction. The language of § 1348 and its predecessor in 1887 and 1911 – "in which they are respectively located" – is not static (as would be if the statute simply stated, *e.g.*, "the location of the bank's main office") but elastic enough to incorporate evolving changes in the law. Contrary to *WMR e-Pin*'s analysis, § 1348 had the flexibility to incorporate changes to corporate citizenship in order to maintain parity, including changes in 1958 to § 1332. *See Firstar*, 253 F.3d at 994 n.5. Thus, nothing in the language of § 1348 suggests Congress intended to depart from the sixty year policy of jurisdictional parity.

In addition, as a matter of statutory construction, the Court notes that as of 1948, *American Surety* was the only appellate opinion directly to consider the meaning of the term "located," as used in § 1348's predecessor statute. *See WMR e-Pin*, 653 F.3d at 716 (Murphy, J., dissenting). "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978) (citations omitted). "So too, where, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute." *Id.* at 581. Thus, it may be presumed that Congress, by reincorporating the language from the 1911 act construed by *American Surety* into § 1348, thereby incorporated *American Surety*'s holding that a national bank has citizenship in its principal place of business. Significantly, at no point did Congress disavow *American Surety* or the Supreme Court's repeated application of jurisdictional parity between national banks and their state-chartered counterparts. *See, e.g.*, *Leather Mfrs.' Nat'l Bank v. Cooper*, 120 U.S. 778, 780 (1887); *Petri v. Commercial Nat'l Bank*, 142 U.S. 644, 650-51

United States District Court

For the Northern District of California

1   (1892); *Herrmann v. Edwards*, 238 U.S. 107, 117-18 (1915); *Fed. Intermediate Credit Bank of*

2   *Columbia, S.C. v. Mitchell*, 277 U.S. 213, 215-16 (1928).

3          Finally, the contention in *WMR e-Pin* that its conclusion comports with the position of the

4   OCC is undermined by the existence of contradictory policy positions taken by the OCC.  The

5   majority opinion in *WMR e-Pin* selectively quoted from the OCC's argument at the Supreme Court

6   hearing in *Schmidt* wherein counsel for the OCC stated he did not "think that a national banking

7   association is a citizen of a State in which its principal place of business is found, insofar as that

8   might be different from the State in which its main office is located."  *See* 653 F.3d at 709-10

9   (quoting Oral Argument at 18:22, *Schmidt*, 546 U.S. 303 (No. 04-1186), *available at*

10  http://www.oyez.org/cases/2000-2009/2005/

11  2005_04_1186/argument ("Oral Arg.")).  However, as pointed out by the dissent in *WMR e-Pin*,

12  counsel for the OCC equivocated on this position at the hearing, noting several times that it was "not

13  an open and shut case" and that the Supreme Court, "in a case that specifically raised the issue[,] . . .

14  could construe 1332(c) . . . as also applying to national banking associations[.]"  *Id.* at 718-19

15  (Murphy, J., dissenting) (quoting Oral Arg.).  Moreover, as pointed out by the dissent in *WMR e-*

16  *Pin*, the OCC had previously issued formal, written opinions recognizing both the state of

17  association and the principal place of business as places where national banks are located.  *See*

18  Office of the Comptroller of the Currency, Interp. Ltr. No. 952, at 6 (Oct. 23, 2002), *available at*

19  http://www.occ.gov/static/interpretations-and-precedents/feb03/

20  int952.pdf; Amicus Br., *Horton v. Bank One, N.A.*, No. 03-50865, 2003 WL 25953465, at *3 (5th

21  Cir. Nov. 24, 2003).  Given OCC's equivocation and earlier embrace of a contrary view, *WMR e-*

22  *Pin*'s reliance on the argument of the OCC before the Supreme Court in *Schmidt* is unpersuasive.

23  C.     Principal Place of Business Legislative History

24         As the Supreme Court recognized in *Schmidt*, the term "located" is not a word of "enduring

25  rigidity" with fixed meaning; it is ambiguous.  546 U.S. at 306.  Hence, its is appropriate to consult

26  legislative history in ascertaining its meaning.

27         Wells Fargo argues that legislative history behind the enactment of principal place of

28  business citizenship for corporations in 1958 demonstrates Congressional intent to sever the

United States District Court

For the Northern District of California

1  jurisdictional parity theretofore applied between national banks and corporations. *See* Def.'s Supp.

2  Br., Docket No. 22.  In particular, Wells Fargo relies on comments buried in 1958 committee reports

3  for the House and Senate describing deliberations in 1932 and 1945 over corporate citizenship. *See*

4  Def.'s Supp. Br., Docket No. 22, at 4-11.  Both reports contain identical language from the Judicial

5  Conference of the United States' Committee on Jurisdiction and Venue stating that

> The problem [of diversity jurisdiction] was discussed at length in
> hearings held in 1932 in reference to bills then pending in the Senate
> to limit Federal jurisdiction.  The view of the then Attorney General,
> William D. Mitchell, of other practicing lawyers and of witnesses for
> *insurance companies, banking institutions, and other business litigants*
> was to the effect that there are occasions and places where prejudice
> against a nonresident is an influential factor in the determination of a
> case and that the right to have a case tried in a Federal court is still
> essential for the proper administration of justice.

11  *See* H.R. Rep. No. 85-1706, at 15 (1958) (emphasis added); S. Rep. No. 85-1830 (1958), at 18.

12  Wells Fargo suggests that the language describing these groups of witnesses suggests that Congress

13  intentionally dealt with diversity jurisdiction for three different groups of entities – insurance

14  companies, national banks, and corporations – separately over the ensuing years. *See* Def.'s Supp.

15  Br. 16-20.  This implies Congress's intent to breach parity.

16         However, Wells Fargo's argument reads too much into this passage.  A plain reading of the

17  passage shows that it only describes the various witnesses who testified at Congressional hearings

18  and does not suggest that Congress intended to systematically address in a discrete and separate

19  manner each of these groups of entities.

20         In fact, what the passage describes as "banking institutions" does not even mean national

21  banks.  The primary "banking institution" witness in 1932 was an attorney for the Investment

22  Bankers Association. *See Limiting Jurisdiction of Federal Courts: Hearing on H.R. 10594, H.R.*

23  *4526, and H.R. 11508 Before the H. Comm. on the Judiciary*, 72d Cong. 52 (1932) ("House

24  Hearing"); *Limiting Jurisdiction of Federal Courts: Hearings on S. 937, S. 939, and S. 3243 Before*

25  *the S. Subcomm. of S. Comm. on the Judiciary*, 72d Cong. 49 (1932) ("Senate Hearing").  The

26  hearing transcripts show no distinction between national banks and other banking institutions.  In

27  fact, the witness from the Investment Bankers Association noted that his organization consisted of

28  "individuals and financial houses engaged in the business of buying investment securities," and

United States District Court

For the Northern District of California

1    included "corporations [and] banks with bond departments." *See* House Hearing 52.  Thus, there is

2    no support for Wells Fargo's suggestion that the reference to "banking institutions" in 1958

3    indicated that Congress contemplated that national banks were to be treated differently from any

4    other banking institution.

5         Moreover, legislative history does not support Wells Fargo's suggested sequence of events.

6    Wells Fargo argues that, following the 1932 deliberations, Congress dealt with banking institutions

7    first, in 1948, when it enacted § 1348, after which it prescribed corporate citizenship in 1958 and

8    insurer citizenship in 1964.  *See* Def.'s Supp. Br. 11.  However, as discussed above, the enactment of

9    § 1348 did not substantively change the language regarding citizenship of national banks.  Rather, it

10   simply restated language first adopted in 1887 providing that national banks "shall . . . be deemed

11   citizens of the States in which they are respectively located."  Thus, Wells Fargo's suggestion that

12   the enactment of § 1348 was part of a deliberate and coherent scheme to address diversity

13   jurisdiction for national banks as a discrete group from 1932 on is not supported.

14        In short, nothing in the legislative history behind § 1332(c)(1) evidences Congressional

15   intent to depart from the application of jurisdictional parity to national banks.

16   D.    Policy

17        Assigning citizenship to a national bank's principal place of business makes eminent sense

18   with respect to the basic policy concerns which generally underpin diversity jurisdiction.

19   "[D]iversity jurisdiction's basic rationale" is to "open[] the federal courts' doors to those who might

20   otherwise suffer from local prejudice against out-of-state parties."  *Hertz Corp. v. Friend*, 130 S. Ct.

21   1181, 1188 (2010).  A national bank is least likely to suffer local prejudice where its principal place

22   of business is located.  Wells Fargo does not contend it is likely to suffer from local prejudice as an

23   out-of-state party in California.

24        Furthermore, it should be noted that the same policy rationale that animated the corporate

25   test of jurisdiction of § 1332(c)(1) in 1958 applies to national banks.  Section 1332(c)(1) was passed

26   in part to curtail "frauds and abuse" under the then-existing rule for corporate citizenship, which was

27   based only on the state of incorporation, allowing a corporation to "open[] the federal courts' doors

28   in a State where it conducted nearly all its business by filing incorporation papers elsewhere."  *Hertz*

17

United States District Court

For the Northern District of California

1    *Corp. v. Friend*, 130 S. Ct. 1181, 1188-89 (2010). That policy would operate with equal force to

2    national banks. The articles of association of a national bank can designate its main office in a

3    particular state just as a corporation can choose its state of incorporation. In either case, this can be

4    done in a manner that is divorced from economic and operational reality, which facilitates venue

5    shopping which § 1332(c) intended to minimize.[5]

6    E.    <u>Federal Savings Associations</u>

7        Wells Fargo also suggests that Congressional enactment of 12 U.S.C. § 1464(x) in 2006,

8    which governed the citizenship of Federal savings associations, evidenced Congress's intent that

9    national banks be treated as citizens only of their states of association. *See* Def.'s Supp. Br. 18-19.

10   12 U.S.C. § 1464(x) provides that a "Federal savings association shall be considered a citizen only

11   of the State in which such savings association has its home office." Wells Fargo suggests that this

12   law demonstrates Congressional intent that a national bank should also only be a citizen of the state

13   in which its home office is located. However, there is no textual support for this interpretation.

14   Wells Fargo is a national bank, not a Federal savings association. National banks and Federal

15   savings associations are subject to different rules and regulations. *See generally* Office of the

16   Comptroller of the Currency, Key Differences Between National Bank Regulatory Requirements

17   and Federal Savings Association Regulatory Requirements, *available at*

18   http://www.occ.treas.gov/publications/publications-by-type/other-publications-reports/Key-differenc

19   es-document-public.pdf (last visited May 14, 2013). Wells Fargo does not point to any law

20   requiring that national banks and Federal savings associations be treated similarly for purposes of

21   diversity jurisdiction. In fact, as noted above, national banks have traditionally been compared to

22

23       [5] The Court notes that Wells Fargo recently moved its headquarters from San Francisco,

24   California to Sioux Falls, South Dakota in 2004, while its parent company, Wells Fargo & Company, maintains its headquarters in San Francisco. *See* FDIC-Insured Subsidiaries of Bank Holding Companies, Wells Fargo & Company, *available* at http://www2.fdic.gov/idasp/main.asp

25   (last visited May 15, 2013) (click "Bank Holding Companies," search for "Wells Fargo" in "BHC Name" field, click on "Wells Fargo & Company," click on "3511," click on "Generate History").

26   *See id.* It seems unlikely that Sioux Falls, South Dakota would be the nerve center from which Wells Fargo conducts its business, particularly where as here, it is undisputed that Wells Fargo's

27   principal place of business is California. While the Court does not attribute any particular motive to Wells Fargo's move in 2004, the facts here illustrate that even large national banks can move their

28   designated main office.

United States District Court

For the Northern District of California

1  corporations and state banks for purposes of determining citizenship, *not* Federal savings

2  associations.  *See Langdeau*, 371 U.S. at 565-66 (predecessor statute to § 1348 sought to limit the

3  access of national banks to federal courts to the same extent as non-national banks); *Schmidt*, 546

4  U.S. at 317-19 (comparing national banks to corporations and state banks); *see also Taheny*, 878 F.

5  Supp. 2d at 1109 (12 U.S.C. § 1464(x) is "not relevant" to the meaning of "located" in § 1348).

6  Wells Fargo has not cited any legislative history, policy and judicial precedent suggesting that

7  Federal savings associations should be equated to national banks for jurisdictional purposes.  Thus,

8  Wells Fargo's argument regarding 12 U.S.C. § 1464(x) is of no avail.

9  F.   <u>Summary</u>

10       In sum, the Court finds Wells Fargo to be a citizen of California, its principal place of

11  business.  This destroys complete diversity in this case.  Thus, the Court **GRANTS** Plaintiffs'

12  motion to remand.

13  G.   <u>Fee Request</u>

14       Plaintiffs' motion to remand seeks attorney fees and costs incurred as a result of the removal.

15  Mot. to Remand 8.  28 U.S.C. § 1447(c) provides that "[a]n order remanding the case may require

16  payment of just costs and any actual expenses, including attorney fees, incurred as a result of the

17  removal."  However, the Supreme Court has held that attorney fees should be granted "only where

18  the removing party lacked an objectively reasonable basis for seeking removal."  *Martin v. Franklin*

19  *Capital Corp.*, 546 U.S. 132, 141 (2005).  Here, Wells Fargo had reasonable grounds for pursuing

20  removal, as numerous courts have found national banks to be citizens of only their state of

21  association.  Thus, the Court **DENIES** Plaintiffs' fee request.

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

**United States District Court**
For the Northern District of California

1

## IV.   CONCLUSION

2       In sum, the Court finds that Defendant Wells Fargo is a citizen of both its state of association

3   and its principal place of business.  As its principal place of business is in California, diversity

4   jurisdiction is lacking.  Thus, the Court **GRANTS** Plaintiffs' motion to remand.  The Court

5   **DENIES** Plaintiffs' request for fees and costs.  In addition, as the Court lacks jurisdiction over this

6   case, it **DENIES** Defendant's motion to dismiss as moot.

7       This order disposes of Docket Nos. 4 and 14.

8

9       IT IS SO ORDERED.

10

11   Dated:  May 21, 2013

12

13                                        _____
                                           EDWARD M. CHEN
14                                        United States District Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28